# WHETHER THE GENERAL SERVICES ADMINISTRATION MAY PROCEED WITH AN ASSISTED ACQUISITION FOR THE DEPARTMENT OF VETERANS AFFAIRS IN FISCAL YEAR 2012 USING THE DEPARTMENT'S FISCAL YEAR 2009/2010 FUNDS

*The Department of Veterans Affairs properly obligated its FY 2009/2010 funds when it and the General Services Administration signed an interagency agreement in August 2010, and GSA may properly use those funds in FY 2012 to perform its obligations under the interagency agreement.*

*GSA may use those funds without running afoul of the requirement, developed by the Government Accountability Office, that servicing agencies acting under interagency agreements perform within a "reasonable time."*

March 2, 2012

## MEMORANDUM OPINION FOR THE GENERAL COUNSEL, DEPARTMENT OF VETERANS AFFAIRS, AND THE GENERAL COUNSEL, GENERAL SERVICES ADMINISTRATION

The Department of Veterans Affairs ("VA") and the General Services Administration ("GSA") have asked whether, consistent with federal appropriations law, they may undertake certain activities contemplated by an interagency agreement between the VA and GSA. This opinion memorializes the advice we provided in response to that question.

In the interagency agreement, GSA agreed to assist the VA in obtaining a new contract for the provision of human resources ("HR") services. Under Part B of the agreement, signed on August 3, 2010, the VA purported to obligate funds from its fiscal year ("FY") 2009/2010 appropriation to GSA. However, as of November 2011, GSA had not engaged in any meaningful services under that agreement because the VA and GSA have, until recently, been waiting for the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM") to review and approve the VA's decision to proceed with a competition among private shared service centers to select the new HR services provider. Those approvals were finally granted in September 2011. The VA would now like to proceed with the acquisition.

Given the fact that it is now FY 2012, both agencies have asked whether GSA may still properly use the VA's FY 2009/2010 funds to provide the agreed-upon assisted acquisition services. More specifically, they have asked whether, in using the VA's funds, GSA would satisfy the requirement, developed by the Government Accountability Office ("GAO"), that servicing agencies acting under interagency agreements perform within a "reasonable time." They also have asked whether the "reasonable time" construct applies at all in this unique context, where the delay in performing the tasks specified in an interagency agreement was

caused not by the servicing agency but rather by the time required for the requesting agency—here, the VA—to meet conditions that had to be satisfied prior to performance.[1]

We informally advised that under the unusual circumstances presented here, the VA properly obligated its FY 2009/2010 funds when the VA and GSA signed Part B of the interagency agreement in August 2010, and that GSA may use those funds without running afoul of the "reasonable time" limitation developed by the GAO. Initially, we hesitated to extend the "reasonable time" concept to delay by requesting as well as servicing agencies in the absence of clear guidance from the GAO. But the logic of the GAO's concept is that an unreasonable delay by the servicing agency may cast doubt on whether the requesting agency had a bona fide need in the year of the appropriation and may suggest that the requesting agency was attempting to "park" funds for use during a later fiscal year. We believe that this logic may also apply when the requesting agency itself has unreasonably delayed performance of its assigned responsibilities, if that delay hinders the servicing agency's ability to use the funds, and circumstances suggest that the requesting agency did not have a bona fide need in the fiscal year of the appropriation. However, on the facts presented here—where the VA had an uncontested bona fide need for a nonseverable service in FY 2010; where neither the VA nor GSA had any reason or incentive to delay the use of the funds; and where the delay was attributable to a new, untried regulatory review process conducted by OMB and OPM—we conclude that neither the VA nor GSA failed to use the funds within a reasonable time and that the VA cannot be charged with having improperly "parked" its FY 2009/2010 funds with GSA.

## I.

As noted above, the VA and GSA have entered into an interagency agreement in which GSA agreed to assist the VA in selecting a new provider of HR information systems services, which, in addition to providing new HR services, would migrate the VA's current HR system to the new system. GSA has the authority to perform these services for the VA under 40 U.S.C. § 501 (2006 & Supp. IV 2010), which authorizes GSA to perform services for executive agencies, and 40 U.S.C. § 321 (2006), which establishes the Acquisition Services Fund that finances GSA's Federal Acquisition Service.[2] The agreement was formed in two parts. The VA and GSA entered into Part A of the agreement on April 30, 2009. That part set out the purpose of the agreement and the respective roles and responsibilities of the two agencies. *See* Interagency Agreement Between Department of Veterans Affairs and General Services Administration, Federal Acquisition Service ("IA"), Part A—General Terms and Conditions. No fiscal obligations were created through the execution of Part A. *See id.* § A.1 (Purpose).

On August 3, 2010, the agencies signed Part B of the interagency agreement, which served as the funding document. The purpose of Part B was "to establish an agreement with the

---

[1] *See* Letter for Virginia A. Seitz, Assistant Attorney General, Office of Legal Counsel, from Will A. Gunn, General Counsel, Department of Veterans Affairs, and Kris E. Durmer, General Counsel, General Services Administration (Nov. 10, 2011), *with accompanying* Memorandum for Virginia A. Seitz, Assistant Attorney General, Office of Legal Counsel, from Will A. Gunn, General Counsel, Department of Veterans Affairs ("VA Mem."), *and* GSA Position Paper on VA Human Resources IT Procurement ("GSA Paper").

[2] Accordingly, GSA was acting under statutory authority independent of the Economy Act, 31 U.S.C. § 1535 (2006).

Servicing Agency [GSA] to assist the Requesting Agency [the VA] in obtaining a new contract to support the selection of a provider of Human Resources Information Systems (HRIS) services and migrate the VA to that provider for those services." IA, Part B—Requirements and Funding Information, § B.1 (Purpose). Part B specified that GSA would procure IT support for the VA and provide acquisition support services, including, among other things, preparing a solicitation, conducting a competition, and administering the contract, in order to assist the VA in migrating to "an HR system that is mandated by OMB." *Id.* §§ B.6, B.9. Part B purported to obligate to GSA $36,710,332.66 of the VA's information technology systems funds, from a two-year appropriation that expired on September 30, 2010. *Id.* § B.12; *see* Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, div. E, tit. II, 122 Stat. 3574, 3706-07 (2008).[3] That total included a fee for GSA of $1,105,000. Part B of the interagency agreement did not condition the obligation of funds on any contingency or the need for regulatory approval.

Section B.9 of Part B incorporated by reference section A.6 of Part A, which set forth the specific roles and responsibilities of the VA and GSA. That section specified, among other things, that the VA, as the requesting agency, had to "comply fully with applicable procurement regulations and policies in all matters related to this IA." IA, § A.6, Requesting Agency Roles and Responsibilities, #4. Among these applicable policies was the requirement, set out in relevant OMB and OPM guidance regarding so-called Human Resources Line of Business ("HRLoB") migrations, that an agency seeking to conduct a less than fully-open competition (such as a private-private or public-public competition) submit a full justification for that approach, set out in an Excepted Business Case ("EBC"), to OMB and OPM.[4] *See* Memorandum for Chief Human Capital Officers et al., from Linda M. Springer, Chairman & Director, Office of Personnel Management, and Clay Johnson III, Vice Chairman & Deputy Director for Management, Office of Management and Budget, *Re: Competition Framework for Human Resources Management Line of Business Migrations* at 4 (May 21, 2007) ("Agencies that wish to conduct a non-competitive migration or a migration based on private-private (if authorized) or public-public competition shall prepare a full justification, generally including the type of information called for by section 6.303-2 of the FAR [Federal Acquisition Regulations System]. . . . Agencies shall confer with OMB prior to proceeding with a migration through other than a public-private competition."); OPM, *Migration Planning Guid*ance, § 7.1, Selection Guidance: Migration Competition Framework ("Migration Competition Framework") ("Agencies that wish to conduct a non-competitive migration or a migration based on private-private competition or public-public competition shall prepare a full justification. . . . Agencies may wish to use the *Exception Business Case Template* . . . in preparing their justification to the Office of Management and Budget."), *available at* http://www.opm.gov/egov/documents/MPG/

---

[3] Section B.12 of the interagency agreement incorrectly stated that the appropriation expired in 2011. The VA and GSA agree that this statement was a clerical error. Section B.11 states that the agreement was for a "severable service." The agencies agree that this statement, too, was in error. As we discuss below, we agree that the services to be performed by GSA were plainly non-severable, or "entire."

[4] Because a congressional rider was construed as barring public-private competitions for HRLoB services, *see* Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, § 737, 123 Stat. 524, 691, federal agencies seeking to migrate to new HR shared service centers were required to conduct either a public-public or a private-private competition, either of which involved a less than full competition. Thus, an EBC was required in any event.

selectionguidance.asp#7.1 (last visited June 7, 2012); *see also* Migration Competition Framework (incorporating by reference the May 21, 2007 OMB memorandum).

Although the precise timing of its choice is unclear, either by the time the VA signed Part B of the interagency agreement or shortly thereafter, the VA had decided to use a private-private competition to select its HR service provider. The extent to which OMB and OPM had the authority to veto that decision is also unclear, but both the VA and GSA understood that the VA was required to submit a justification for its decision to OMB and OPM to obtain these agencies' approval. That understanding was not only supported by the OMB-OPM guidance requiring migrating agencies contemplating a public-public or private-private competition to submit an EBC to and "confer" with OMB before proceeding, but also was apparently confirmed in a meeting in August 2010 in which, according to subsequent VA e-mails, OMB and OPM provided the VA guidance on how to proceed with its HR services acquisition and suggested that the VA submit an EBC justifying its choice of either a public or private sector provider. VA Mem., App. A, ¶ 16; *see* E-mail for Tonya Deanes (SES), from Robert Baratta (HRIS), *Re: OMB/OPM Meeting on HRIS* (Aug. 2, 2010 3:24 PM) (cc: omitted); E-mail for Carol A. Bales, from Robert Baratta (HRIS), *Re: VA's Plan for Selecting an HR LoB Shared Services Center* (Aug. 23, 2010 3:24 PM) (cc: omitted). In addition, the memorandum from OPM ultimately recommending that the VA be allowed to proceed with its planned private-private competition states that agencies seeking to select and migrate to a new HR service provider "must seek OPM's and OMB's approval of their selection and migration decision"; and at the end of the memorandum, a box next to "Approve" is checked. Memorandum for Matthew E. Perry, Chief Information Officer, Office of Personnel Management, from Elizabeth A. Mautner, Program Manager, HR LOB, Office of Personnel Management, *Re: Human Resources Lines of Business, Department of Veterans Affairs—Exception Business Case* at 1, 2 (Sept. 29, 2011) ("OPM Approval Mem.").

The VA's submission of an EBC to OMB and OPM to justify a private-private competition was the first such submission ever made under the HRLoB process. The VA and GSA expected relatively quick approval, but the process of preparing an EBC and obtaining OMB and OPM approval was new and untried and took far longer than the VA and GSA had expected. *See* VA Mem. at 6 ("It is important to note that no other federal agency has ever undertaken this exact private-private competition to modernize and migrate its HRLoB systems. No agency has gone through the OMB/OPM review process. There are no benchmarks, no regulatory deadlines, or temporal boundaries to guide the HRLoB migration."); GSA Paper at 2 ("The time it took for VA to obtain final approval of its EBC was substantially longer than either VA or GSA anticipated when they entered the IA[]."). The VA submitted a draft EBC to OPM in September 2010, VA Mem., App. A, ¶ 17, but the VA needed both to conduct further market research before the EBC could pass muster with OMB and OPM, and to obtain necessary internal approvals. VA Mem. at 6. Various unexpected developments delayed the necessary market research and vendor demonstrations, and the VA did not submit a final EBC for review until June 2011, followed by an updated version in August 2011. *Id.* at 6 & App. A, ¶¶ 27, 31. In the meantime, in November 2010, GSA advised the VA by letter that it would be unable to proceed with the issuance of a solicitation for bids until the VA's EBC was approved. Letter for Robert Baratta, Director, HR Line of Business/HRIS Program Office, Department of Veterans Affairs, from Bjorn Miller, Contracting Officer, General Services Administration, *Re: Approval of Exception Business Case* (Nov. 4, 2010).

On or about September 12, 2011, OMB notified the VA that it had approved its planned private-private competition.  VA Mem., App. A, ¶ 32.  On September 29, 2011, at the very end of FY 2011, the HRLoB (OPM) program manager also recommended that the VA be allowed to proceed with its plan.  *Id.* ¶ 33; OPM Approval Mem.  As of that date, GSA had engaged in no meaningful services under the interagency agreement and had made no charges against the obligated funds.  The VA and GSA are ready to proceed with the acquisition, but prior to doing so have asked this Office whether GSA may properly use the VA's FY 2009/2010 funds in FY 2012.

## II.

Under the VA and GSA's interagency agreement, the VA obligated FY 2009/2010 funds in order to obtain "acquisition services" from GSA—in particular, GSA's assistance in selecting a new HR provider for the VA and administering the contract with that provider.  We advised that GSA may properly use those funds to perform its obligations under the interagency agreement, for three principal reasons.  First, we think that the funds were validly obligated to procure nonseverable services for which the VA had a bona fide need in FY 2010 (during the availability of its appropriation), and it is settled law that such validly obligated funds can be used in subsequent fiscal years.  Second, we do not think that the fact that the VA had to navigate a novel regulatory approval process before GSA could begin work renders the obligation invalid.  And third, we conclude that the "reasonable time" doctrine does not prohibit GSA from using the funds, even though they are FY 2009/2010 funds that would be used in FY 2012.

## A.

The recording statute, 31 U.S.C. § 1501 (2006), contemplates that agencies may enter into binding agreements creating recordable obligations with other agencies.  *See id.* § 1501(a)(1) ("An amount shall be recorded as an obligation of the United States Government only when supported by documentary evidence of . . . (1) a binding agreement between an agency and another person (including an agency) . . . .").  It is settled fiscal law that where, as here, an interagency agreement is based on statutory authority other than the Economy Act,[5] an obligation under the agreement "will remain payable in full from the appropriation initially charged, regardless of when performance occurs, in the same manner as contractual obligations generally" if it satisfies "the *bona fide* needs rule and . . . any restrictions in the legislation authorizing the agreement."  2 General Accounting Office, *Principles of Federal Appropriations Law* 7-30 (3d ed. 2006) ("*Federal Appropriations Law*").  "An interagency agreement . . . is akin to a contract and the obligational consequences are the same as if it were a contract."  *Chemical*

---

[5]  The Economy Act provides authority for agencies to contract with other agencies for goods or services.  That Act requires that an amount obligated by one agency to another be deobligated if the agency filling the order has not incurred obligations to "provid[e] goods or services" or "mak[e] an authorized contract with another person to provide the requested goods or services," "before the end of the period of availability of the appropriation."  31 U.S.C. § 1535(d).  As GSA points out, however, *see* GSA Paper at 1 n.1, the interagency agreement between the VA and GSA rests on authority independent of the Economy Act (40 U.S.C. §§ 321, 501), and thus is not subject to this restriction.  *See, e.g.*, *Nat'l Park Serv. Soil Surveys*, B-282601, 1999 WL 795735, at *2 (Comp. Gen. Sept. 27, 1999) ("Where an interagency agreement is based on specific statutory authority independent of the Economy Act, the funds do not expire at the end of the period of availability if they have been otherwise properly obligated.").

*Safety & Hazard Investigation Bd.—Interagency Agreement with the Gen. Servs. Admin.*, B-318425, 2009 WL 5184705, at *1 n.6 (Comp. Gen. Dec. 8, 2009).[6]

For contracts generally, as well as interagency agreements, funds may be obligated for the provision of services beyond the fiscal year of a time-limited appropriation only to the extent that a bona fide need existed in the year that obligational authority existed, and that the services constitute a single nonseverable undertaking. *See Transfer of Fiscal Year 2003 Funds from the Library of Congress to the Office of the Architect of the Capitol*, B-302760, 2004 WL 1146276, at *5 n.9, *7 (Comp. Gen. May 17, 2004) (Library of Congress's FY 2003 funds obligated to the Architect of the Capitol through an interagency agreement are available for use in FY 2004 and 2005 to redesign and renovate a loading docket); *In re Interagency Agreement—Admin. Office of the U.S. Courts*, 55 Comp. Gen. 1497, 1498, 1500-01 (1976) (interagency agreement for automatic data processing services constitutes a valid obligation against the FY 1976 appropriation even though the necessary work would be performed in both FY 1976 and 1977); *see also Indep. Statutory Auth. of Consumer Prod. Safety Comm'n to Enter Into Interagency Agreements*, B-289380, 2002 WL 31628522, at *2 (Comp. Gen. July 31, 2002); *Nat'l Park Serv. Soil Surveys*, B-282601, 1999 WL 795735, at *3; *Obligation of Funds for Purchase of Oil for Strategic Petroleum Reserve*, B-193005, 1978 WL 11174, at *3 (Comp. Gen. Oct. 2, 1978); *HUD-Corps of Eng'rs Flood Ins. Studies*, B-167790, 1977 WL 12105, at *2 (Comp. Gen. Sept. 22, 1977). Appropriated funds remain available to liquidate obligations properly chargeable to that account for five fiscal years after the period of availability. *Library of Congress*, B-302760, 2004 WL 1146276, at *5 n.9 (citing 31 U.S.C. §§ 1552(a), 1553(a) (2006)).

Here, we believe that the VA had a bona fide need in FY 2010, when its obligational authority still existed, and that the services for which it was contracting were nonseverable. We discuss each conclusion in turn. The bona fide needs rule is a longstanding gloss by the GAO on the requirements of 31 U.S.C. § 1502 (2006).[7] The rule is that "[a] fiscal year appropriation may be obligated only to meet a legitimate, or *bona fide*, need arising in, or in some cases arising prior to but continuing to exist in, the fiscal year for which the appropriation was made." 1 *Federal Appropriations Law* 5-11 (3d ed. 2004); *see also Funding of Grants by the National Institutes of Health*, 10 Op. O.L.C. 19, 21 (1986) ("*Funding of Grants*"); *Nat'l Park Serv. Soil Surveys*, B-282601, 1999 WL 795735, at *3. Consistent with this rule, delivery of goods or performance of services in a fiscal year subsequent to the year in which a contract is

---

[6] In addressing issues of fiscal law, we give serious consideration to the views of the Comptroller General, although they are not "controlling for executive branch officers." *Use of General Agency Appropriations to Purchase Employee Business Cards*, 21 Op. O.L.C. 150, 151 (1997); *see also id.* ("[T]he opinions and legal interpretations of the Comptroller General, although useful sources on appropriations matters, are not binding upon departments or agencies of the executive branch."). In addressing the issues here, we agree with the GAO's general approach.

[7] The statute provides in relevant part:

The balance of an appropriation or fund limited for obligation to a definite period is available only for payment of expenses properly incurred during the period of availability or to complete contracts properly made within that period of availability and obligated consistent with section 1501 of this title. However, the appropriation or fund is not available for expenditure for a period beyond the period otherwise authorized by law.

31 U.S.C. § 1502(a).

executed does not necessarily preclude charging earlier fiscal year funds with the full cost of the goods or services. The test is whether the goods or services meet a bona fide need during the period in which obligational authority exists, regardless of when the work is actually performed. *EEOC—Payment for Training of Mgmt. Interns*, B-257977, 1995 WL 683813, at *2 (Comp. Gen. Nov. 15, 1995); *see also Library of Congress*, B-302760, 2004 WL 1146276, at *5 & n.9.

The VA maintains that it had a clear bona fide need in FY 2010, during the availability of its two-year appropriation, to migrate its HR systems to a modern shared service center. VA Mem. at 2; *see also* IA, § B.6 (describing the VA's bona fide need to provide continuous HR services and support to its employee population and to migrate those services and support to an approved third-party provider by direction from OMB under the HRLoB initiative). Consistent with this contention, the VA's Determinations and Findings supporting the interagency agreement, signed by the VA in June 2010, expressed the VA's goal of selecting a new provider as soon as possible in FY 2010. Determinations and Findings for Project Entitled Human Resources Information Systems (HRIS) Human Resources Migration at 3. GSA does not dispute that the VA had a bona fide need for GSA's acquisition assistance services at the time the agencies signed Part B of the interagency agreement; indeed, GSA believes that the VA validly obligated its FY 2009/2010 funds at that time. GSA Paper at 3. GSA likewise does not dispute that the VA's bona fide need continues to exist.

A bona fide need, moreover, may arise in one fiscal year for services that by their nature cannot be separated for performance in separate fiscal years. The GAO has explained that the question whether to charge the appropriation current on the date the contract is made or the funds current at the time services are rendered depends upon whether the services are "severable" or "entire." 1 *Federal Appropriations Law* at 5-23; *see also Funding of Grants*, 10 Op. O.L.C. at 22. "The term 'severable services' refers to those services which are continuing and recurring in nature, such as window cleaning, maintenance or security services"; they are services "that can be separated into components that independently provide value to meet agency needs." *Nat'l Park Serv. Soil Surveys*, B-282601, 1999 WL 795735, at *3. Under the bona fide needs rule, any portion of severable services completed in a subsequent fiscal year is chargeable only to appropriations available in the subsequent year. *Id.*

By contrast, an entire, or nonseverable, service is one that is not recurring in nature; such a service is more akin to a single project, the components of which do not individually provide value to the agency. For example, training tends not to be severable. 1 *Federal Appropriations Law* at 5-27; *Proper Appropriation to Charge for Expenses Relating to Nonseverable Training Course*, 70 Comp. Gen. 296, 297 (1991); *EEOC—Payment for Training of Mgmt. Interns*, B-257977, 1995 WL 683813, at *2. A nonseverable service for which an agency had a bona fide need at the time the agency orders or contracts for the service is properly charged to an appropriation current when the agency enters into the contract. *Chemical Safety & Hazard Investigation Bd.*, B-318425, 2009 WL 5184705, at *3; *see, e.g.*, *Library of Congress*, B-302760, 2004 WL 1146276, at *5 n.9 (construction of building loading docket was nonseverable undertaking); *Proper Fiscal Year Appropriation to Charge for Contract and Contract Increase*, 65 Comp. Gen. 741, 743 (1986) (study on adjustment needs of Vietnam veterans was not severable and should have been charged to the appropriation available when the contract was executed); *Incremental Funding of U.S. Fish & Wildlife Serv. Research Work Orders*, 73 Comp. Gen. 77, 79-80 (1994) (research work order was "entire" for purposes of the bona fide needs rule

and thus chargeable to the appropriation available at execution rather than funds current when the research was performed).

We agree with the VA and GSA that, in this instance, the VA contracted with GSA to obtain indivisible acquisition assistance services that would culminate in the selection of and migration to a new HR services provider. The individual activities in which GSA is to engage pursuant to the interagency agreement will be of no independent value to the VA; the point of the agreement, and its entire value to the VA, will be realized only when the migration of the VA's HR systems to the new provider is complete. Under these circumstances, we think that GSA's services are nonseverable. *See Financial Crimes Enforcement Network—Obligations Under a Cost-Reimbursement, Nonseverable Servs. Contract*, B-317139, 2009 WL 1621304, at \*5 (Comp. Gen. June 1, 2009) (contract called for delivery of a defined end product—the design, development, and deployment of a data retrieval system—and thus was for a nonseverable services contract). Because the VA had a bona fide need in the year that obligational authority existed, and the services for which it contracted with GSA constitute a single nonseverable undertaking, GSA can perform services under the interagency agreement in a later fiscal year so long as the VA otherwise properly obligated the funds. *See Continued Availablity of Expired Appropriation for Additional Project Phases*, B-286929, 2001 WL 717355, at \*4 (Comp. Gen. Apr. 25, 2001) ("Nothing in the bona fide needs rule suggests that expired appropriations may be used for a project for which a valid obligation was not incurred prior to expiration merely because there was a need for that project during that period.").

## B.

GSA agrees that the VA successfully obligated its FY 2009/2010 funds when the agencies signed Part B in August 2010. GSA Paper at 3. Although the agencies do not dispute that the funds were validly obligated, we considered whether the agreement satisfied the various statutory and GAO requirements for a valid obligation, including specificity, certainty, and definiteness. We also considered whether the existence of a required regulatory approval process post-dating the execution of Part B of the interagency agreement—through which the VA had to secure OMB and OPM concurrence before GSA could issue a solicitation and begin providing its assisted acquisition services—rendered the VA's attempt to obligate its funds in August 2010 invalid. As we now explain, we conclude that the obligation satisfied these requirements and that the regulatory approval process did not render the obligation invalid.

Part B of the interagency agreement, which purports to obligate the VA's FY 2009/2010 funds to GSA, satisfies the basic criteria for an "obligation" under the recording statute— namely, that an amount to be recorded as an obligation of the United States be supported by "documentary evidence of . . . a binding agreement between an agency and another person (including an agency) that is . . . in writing, in a way and form, and for a purpose authorized by law" and "executed before the end of the period of availability for obligation of the appropriation or fund used for specific . . . work or service to be provided." 31 U.S.C. § 1501(a)(1).

In our view, Part B also satisfies the basic definition of "obligation" set out in a long line of GAO authorities. *See, e.g.*, 2 *Federal Appropriations Law* at 7-3 (defining "obligation" as "a definite commitment which creates a legal liability of the Government for the payment of appropriated funds for goods and services ordered or received"); *see also* General Accounting

Office, GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* 70 (2005); *To the Administrator, Agency for Int'l Dev.*, 42 Comp. Gen. 733, 734 (1963). To be valid, an obligation of appropriations must be "definite and certain," 2 *Federal Appropriations Law* at 7-3, and the agreement must be for "specific" goods or services, *id.* at 7-17; 31 U.S.C. § 1501(a)(1)(B). As the Comptroller General has explained, "Congress did not want agencies to record obligations against current appropriations based on inchoate agreements—whether with vendors or other agencies." *Expired Funds & Interagency Agreements between GovWorks & Dep't of Defense*, B-308944, 2007 WL 2120292, at *7 (Comp. Gen. July 17, 2007).

While the need for a regulatory step to be taken during the pendency of the VA's and GSA's agreement adds a complication on which we have found little guidance, the interagency agreement between the VA and GSA was, in our view, sufficiently definite, certain, and specific within the meaning of those terms as articulated by the GAO to create a binding obligation. Part B specifies the acquisition-related services the VA engaged GSA to perform. Part A, incorporated by reference in Part B, further delineates the roles and responsibilities of both the VA and GSA. Although the VA was required to obtain advance OMB-OPM approval of its plan to conduct a private-private competition, and although Part B of the agreement does not specify that GSA would be assisting the VA in conducting a private-private (as opposed to some other form of) competition, the services the VA asked GSA to provide were not so vague, contingent, tentative, or uncertain that they would cause the agreement to fail the GAO's specificity test. Rather, the VA hired GSA to provide "acquisition services" that consisted of conducting a competition for a new HR services provider for the VA.

In providing this specific, definite description of the tasks the servicing agency was to perform, the interagency agreement between the VA and GSA stands in contrast to other situations in which the GAO has found an agreement too indefinite or inchoate to form a valid obligation. *See, e.g.*, *To Betty F. Leatherman, Dep't of Commerce*, 44 Comp. Gen. 695, 697-98 (1965) (no "firm and complete" order for printing of sales promotion materials when a manuscript was not provided until more than seven months after the end of the fiscal year); *Natural Res. Conservation Serv.—Obligating Orders with GSA's AutoChoice Summer Program*, B-317249, 2009 WL 2004210, at *5-*6 (Comp. Gen. July 1, 2009) (agency's order for motor vehicles was not "firm and complete" because the agency could not finalize its order until the following fiscal year when the next-year model car information first became available); *GovWorks*, B-308944, 2007 WL 2120292, at *7 (three of four interagency agreements were too vague in their descriptions to establish the rights and duties of the Department of Defense and GovWorks—e.g., "equipment through the Pentagon IT Store"); *Status of Purchase Order as Obligation*, B-196109, 1979 WL 11928, at *1 (Comp. Gen. Oct. 23, 1979) (order lacking a description of the products to be provided, but which relied on "requisitions" to be sent under separate cover, was not "firm and complete"); *Dir. Int'l Operations Div.*, B-155708-O.M. (Comp. Gen. Apr. 26, 1965) (loan agreement between United States and Brazil was not sufficiently "definite or specific" in providing that the funds would be used to finance programs in certain areas "as may, from time to time, be agreed upon in writing by A.I.D. and the Government"), *available at* http://redbook.gao.gov/4/fl0016226.php (last visited June 7, 2012); *To the Honorable Sec'y of State*, B-147196, 1965 WL 2883, at *2-*4 (Comp. Gen. Apr. 5, 1965) (contracts were not specific as to services to be rendered when they provided for funds for refugee assistance "as determined by the supervising officer").

As we have noted, the fact that a particular regulatory step had to be taken after the agencies signed Part B of the interagency agreement complicates our assessment of the agreement's specificity and definiteness. We have not found definitive analysis on this point by the Comptroller General. For purposes of discussion, we accept the VA's and GSA's view that review and concurrence by OMB and OPM in the VA's planned private-private competition was a necessary regulatory step to be completed in the process before GSA was free to use the funds in conducting the acquisition. This step appears to have been the responsibility of the VA, the requesting agency. *See* IA, § A.6, Requesting Agency Roles and Responsibilities, #4 (requesting agency must "comply fully with applicable procurement regulations and policies in all matters related to this IA"). Nevertheless, we do not perceive the requirement that the VA pursue this consultation-concurrence step as negating either the certainty or definiteness of the obligation the VA undertook with GSA. In at least one instance, the Comptroller General concluded that a contract with an express regulatory contingency was nonetheless sufficiently definite to create a valid obligation. *See Lawrence W. Rosine Co.*, 55 Comp. Gen. 1351, 1354-55 (1976) (award to a business on the condition that the contract would be terminated at no cost if the Small Business Administration found that it was not a small business was sufficiently definite to create a binding agreement supporting the obligation of funds). Here, the VA obligated its FY 2009/2010 funds to GSA without even imposing an express condition in Part B—the obligation, in other words, was more certain and definite than the one at issue in *Rosine* because it was not *expressly* conditioned on OMB-OPM approval, which seems instead to be part of an assumed regulatory background for the contract. Furthermore, under Part A of the interagency agreement, section A.12, both agencies retained the right to terminate the agreement upon 30 days' written notice, enabling either agency to cancel the agreement in the event that a failure by OMB or OPM to approve the contemplated competition or conditions placed on that competition prevented GSA from carrying out the duties imposed on it under the interagency agreement. Thus, the agreement was definite, certain, and specific as written and understood by the agencies, but in the event that OMB or OPM interceded with a requirement that would have prevented GSA's performance, the agreement could have been terminated by either agency. We conclude, therefore, that the VA's obligation to comply with the OMB-OPM review process did not preclude it from entering into a binding agreement with GSA.

## C.

Finally, although GSA agrees that the VA validly obligated its FY 2009/2010 funds when it signed Part B of the interagency agreement, GSA asks whether it will have acted within a "reasonable time" of the obligation of the funds if it renders services under the agreement more than one fiscal year after the funds' expiration. It also asks whether the "reasonable time" for a servicing agency to perform applies only to the time required for the servicing agency to fulfill its duties or whether it also includes time required by the requesting agency to satisfy conditions necessary for the servicing agency to begin performance. *See* GSA Paper at 2-4. We believe that on the facts presented here, the "reasonable time" requirement developed by the GAO would not prevent GSA from performing under the interagency agreement and using the funds in FY 2012.

The GAO has adopted a requirement, as a further gloss on the bona fide needs rule, that the servicing agency in an interagency agreement award a contract to a third-party or otherwise perform within a "reasonable time." Although we have discovered little fiscal law from the

Comptroller General on this point, the GAO appears to use a "reasonableness" standard to evaluate the timeliness of a performing agency's actions. For example, in answering the question how long a performing agency has to execute a contract with a third party, consistent with the bona fide needs rule, the GAO has explained: "There is no hard and fast rule in this regard. Rather, the GAO uses a 'reasonableness' standard when evaluating the timeliness of a performing agency's actions, examining the circumstances surrounding transactions on a case-by-case basis." *See* General Accounting Office, *Interagency Transactions: Roles and Responsibilities—Frequently Asked Questions*, #3 (Mar. 13, 2008) ("GAO *FAQ*"), *available at* http://www.gao.gov/special.pubs/appforum2008/interagencytransactions.pdf (last visited June 7, 2012). The Comptroller General has applied this test in circumstances in which an unreasonable delay on the part of the servicing agency might cast doubt on whether the requesting agency had a bona fide need for the goods or services during the fiscal year in which the funds were obligated.

The GAO's decision in *GovWorks*, B-308944, 2007 WL 2120292, an example of an agency's failure to satisfy the reasonable time requirement, involved circumstances wholly distinguishable from those here. In that case, the Department of Defense incurred an obligation against its FY 2004 appropriation in April 2004, when it transferred FY 2004 funds to GovWorks to obtain laser printers. GovWorks did not execute the contract to acquire those printers until almost 17 months later and 11 months after the end of FY 2004. The GAO had "no information suggesting that the printers GovWorks purchased on DOD's behalf [were] anything but readily available commercial items that GovWorks could have purchased on DOD's behalf with little lead time." *Id.* at *8. As such, the GAO found it "unreasonable" that GovWorks took 17 months to execute the contract to purchase the printers. *Id.* The GAO treated the passage of time prior to execution of the contract for the printers as strong evidence that, rather than fulfilling a bona fide need of FY 2004, the contract at best fulfilled a need of FY 2005. Moreover, the GAO concluded that, by transferring funds to GovWorks under several inadequate interagency agreements, three of which lacked specificity, the Department of Defense had improperly "parked" funds at GovWorks in an effort to extend the availability of time-limited appropriated funds. *Id.* at *10; *Federal Appropriations Law*, Annual Update of the Third Edition 5-3 (2011) (discussing the *GovWorks* decision), *available at* http://www.gao.gov/special.pubs/appforum2011/d11210sp.pdf (last visited June 7, 2012). In this instance, by contrast, the VA was not contracting for the purchase of a readily available commodity or service but for a major project, the migration of its HR system to a new provider. Nor, the agencies agree, was the delay in the use of the funds within the control of the servicing agency, GSA.

We know of no GAO decision applying the "reasonable time" restriction to delays on the part of the requesting, rather than the servicing, agency. But we also see no reason in principle why the logic of this GAO standard would not extend to unreasonable delays by the requesting agency, including delays that would cast doubt on whether the agency entered into an interagency agreement to fulfill a bona fide need of that first fiscal year and delays that would suggest that the agency was "parking" funds to prevent their lapse. We are not required to decide whether the "reasonable time" doctrine extends to delays on the part of the requesting agency, however, because even assuming it does, under the unusual circumstances present here, the VA has satisfied any such requirement.

In procuring a new HR system, the VA was proceeding under a new and untried regulatory process that involved obtaining approval from OMB and OPM to conduct a private-private competition. At the time the VA and GSA signed Part B of the interagency agreement, there were no benchmarks or settled expectations about the amount of time it would take to prepare an EBC that would pass muster and for OMB and OPM to concur. VA Mem. at 6; GSA Paper at 2. The VA and GSA believed that the process would be reasonably quick, and certainly not as long as a year. Indeed, the VA's Determinations and Findings supporting the interagency agreement, signed by the VA in June 2010, expressed the VA's goal of selecting a new provider as soon as possible in FY 2010. Neither the VA nor GSA had any incentive to delay the performance of the agreement or the issuance of the solicitation. The VA's immediate need for the HR migration in FY 2010 was clear and undisputed; and, as noted above, the agreement was definite and intended for the acquisition of a unique, rather than routinely available, product. We have been given no basis to believe that the delay in OMB's and OPM's approval was attributable to dilatoriness by the VA. On these facts, and in the absence of any reason the VA should have expected the EBC process to take an entire fiscal year to complete, we conclude that the VA acted reasonably, that the delay was not attributable to any fault on its part, and that the lapse of time did not throw into question the VA's bona fide need for GSA's services in FY 2010, when it obligated the funds.

Finally, we find that GSA would not run afoul of the "reasonable time" requirement by further contracting the VA's funds in FY 2012, two fiscal years after the VA incurred the obligation, rather than in the following year. *See, e.g.*, *Library of Congress*, B-302760, 2004 WL 1146276, at *8 (FY 2003 funds could be applied to cover costs incurred in FY 2004 and 2005). Again, our understanding of the reasonable time concept is that it is contextual and imposes no rigid standard regarding the time in which a servicing agency must perform under an interagency agreement. *See* GAO *FAQ*, #3. Because the OMB and OPM approvals have only recently been issued, and because we do not think the delay in obtaining those approvals violates the "reasonable time" requirement, we also conclude that GSA's reasonably timely performance following issuance of those necessary approvals would not violate that requirement.

For all of these reasons, we conclude that, in the unique circumstances here, the "reasonable time" requirement would not be violated by GSA's use of the VA's FY 2009/2010 funds in FY 2012, even if that requirement applies to delay by a requesting agency.

/s/

VIRGINIA A. SEITZ
Assistant Attorney General